## GALVESTON, H. & S. A. RY. CO. v. POTTER FLORAL & CONFECTIONERY CO.
(No. 2148.)

Court of Civil Appeals of Texas. El Paso. April 26, 1928.

Rehearing Denied May 3, 1928.

1. Railroads ⚷114(4)—Whether railroad provided necessary culverts, and whether failure to do so proximately caused damage to plaintiff's plants by water, held for jury (Rev. St. 1925, art. 6328).

In action for damages alleged to have been caused by negligence of railway company, whereby plaintiff's property was flooded by water during, and subsequent to, rainfall, damaging plants on plaintiff's land, question whether railroad company provided necessary culverts or sluices as natural lay of land required as required under Rev. St. 1925, art. 6328, and whether failure to do so was proximate cause of 'damage complained of, *held* for jury.

2. Railroads ⚷113(10)—That another's act is contributing cause of damage does not relieve railroad failing to perform statutory duty of maintaining drainage culverts (Rev. St. 1925, art. 6328).

That act of another is likewise an efficient cause or contributing cause for damage complained of does not relieve railroad company from consequences of failure to perform statutory duty, under Rev. St. 1925, art. 6328, to provide necessary culverts or sluices as natural lay of land requires for necessary drainage thereof.

3. Damages ⚷221—Issue regarding damage caused by railroad's diversion of surface water held properly submitted, where evidence showed growing plants had market value when destroyed.

In action against railroad for damages to plaintiff's growing plants caused by diversion

of surface water, submitting issue what sum would reasonably compensate plaintiff for damage proximately caused by diversion of surface water *held* not error, where evidence showed growing plants had market value, and that such value was destroyed by water.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Action by the Potter Floral & Confectionery Company against the Galveston, Harrisburg & San Antonio Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

· Kemp & Nagle, of El Paso, and Baker, Botts, Parker & Garwood, of Houston, for appellant.

Walter H. Scott, City Atty., David E. Mulcahy, Co. Atty., and Jones, Hardie & Grambling, all of El Paso, for appellee.

· WALTHALL, J. The Potter Floral & Confectionery Company, a corporation, brought this suit against the Galveston, Harrisburg & San Antonio Railway Company for damages alleged to have been sustained by it by reason of alleged negligence on the part of said railway company, whereby plaintiff's property was flooded by water during, and subsequent to, a rainfall on July 27, 1926. Plaintiff alleged, in substance, that on said date there was a rainfall over a large area north of its land and over its land and other adjacent lands, and that the defendant's roadbed, elevated above the surrounding and adjacent lands, collected the water that fell on the north and northwest side thereof, and served as a dam, which obstructed the natural drainage; that the water north of the roadbed was thereby and by its borrow pits diverted from its natural drainage, and caused to flow through culverts or sluices onto plaintiff's lands.

The specific negligent acts alleged and submitted by the court are substantially as follows: That the defendant on said date maintained its roadbed adjacent to plaintiff's property without constructing such culverts or sluices as were necessary to permit the surface water in the vicinity of plaintiff's land to flow in accordance with the natural lay of the land for the necessary drainage thereof as it did before the railroad was constructed; and that, by reason of the construction and maintenance of its roadbed as alleged, more surface water was caused to flow onto, and to be collected upon, plaintiff's land than would otherwise have occurred.

Plaintiff alleged that, by reason of the negligent acts of defendant complained of, it was damaged as follows, and in the following amounts: In the sum of $4,000 by reason of the destruction of 16,000 chrysanthemum plants; in the sum of $75, by reason of the destruction of 50 bougainvilleas, Crimson Lake; in the sum of $100 by reason of the destruction of 100 bougainvilleas, Sandrina, two-year old plants growing on plaintiff's land; in the sum of $50 by reason of the destruction of 100 dahlia plants; in the sum of $250 by reason of the destruction of 500 three year old status plants; in the sum of $150 by reason of the destruction of 300 Japan lilies in pots, aggregating in value and damage the sum of $4,625.

Plaintiff joined in the suit, as defendants, the city of El Paso, and the county of El Paso, as having constructed certain highways and canals, but each having been dismissed out of the suit, and, no point having been raised as to either, we need not further refer to either or their pleadings.

The defendant railroad company answered by general demurrer, general denial, and plea of contributory negligence, in which it is alleged that plaintiff's property was situated, and his houses, buildings, trees, shrubs, vines, flowers, and other property were constructed and placed, in a natural depression; that the defendant railway company had constructed its roadbed about the year 1882, and had provided the necessary culverts and sluices for rainfall that fell and accumulated; that the El Paso county road and county and state highway traversed plaintiff's property on the south; that the railroad traversed said property on the north; that plaintiff's property was situated in a triangular depression, bounded on the north by the railway company's right of way and on the south by the public road; that the natural flow of the storm waters is from the northwest toward the southeast across plaintiff's land; that, under the conditions existing when plaintiff established its nursery, and at the time of the flow of the water complained of, irrespective of any act on the part of the railway company, and irrespective of whether or not its roadbed and embankment was or was not located where it was, the plaintiff would have had the same amount of water accumulate and stand on its premises as did accumulate and stand thereon; that the said rain was extraordinary, and could not have been anticipated by the exercise of ordinary care.

The case was tried and submitted to a jury upon special issues.

On the issues submitted the jury found, in substance:

(1) The railway company, at the time alleged, maintained its roadbed adjacent to plaintiff's property without such culverts or sluices as were necessary to permit the surface water in the vicinity of plaintiff's land to flow in accordance with the natural lay of the land as it did before the railroad was constructed.

(2) The failure of the railway company to maintain its roadbed adjacent to plaintiff's land, as in the above finding, caused more surface water to flow on or be collected upon

plaintiff's land than would otherwise have occurred.

(3) The proximate result of such additional water flowing on, and being collected on, plaintiff's land, plaintiff suffered such damages as is complained of in his petition.

(4) The rainfall in the watershed from which the water reaching plaintiff's land was derived was not so unusually excessive as that the railway company, in the exercise of ordinary care, could not have reasonably anticipated.

(5) $2,500, plus 6 per cent. interest, would reasonably compensate plaintiff for the damage proximately caused by such diversion of the surface water by the railway company onto plaintiff's land.

On the verdict, as above, judgment was entered in plaintiff's favor for the principal sum found, with interest. Judgment was also entered that plaintiff take nothing as to the city and county of El Paso. From the above judgment the railway company prosecutes this appeal.

### Opinion.

Appellant submits nineteen propositions assigning error.

The first three propositions are grouped. They challenge the sufficiency of the evidence to sustain the findings of the jury on the issues of the railway company's maintenance of its roadbed without sufficient culverts or sluices, and thereby causing more surface water to flow on appellee's land than would otherwise have occurred, and proximate result of such failure. The propositions are substantially to the effect that there was no evidence that the railway company, by failure to perform the duty to provide sufficient culverts or sluices, was the proximate cause of any damage complained of; that the uncontroverted evidence shows that appellee would have suffered the same damage it did suffer had there been no railroad track or embankment in the vicinity of the watershed near which its property was located; that the uncontroverted evidence shows that appellant's property is located in a natural depression; that the natural drainage was from the northwest to the southeast, and that the land south of, and adjacent to, appellee's property is higher than appellee's property, and extending in an easterly direction, and at all places higher than the high-water mark of the water on appellee's land; that the acts of the railway company complained of are in no event the proximate cause of any damage to appellee's property complained of.

On the above propositions, appellant, in its brief, quotes largely from the evidence. The evidence is too voluminous to incorporate in the opinion. Two maps, unquestioned as to their accuracy, are found in the statement of facts, and from which, and from their personal observation and knowledge, a number of witnesses, including engineers, testified, indicating on the map, and independent of the map, and by their testimony testified, to the elevations of the lands for some 3 miles along the railway company's railroad bed, its right of way, the area and elevations and natural slope of the lands adjacent thereto on either side of the railroad bed, and adjacent to appellee's land, and stating on the map, and by their testimony, indicated the movements of the water on both sides of the railroad bed, in some instances from personal observation, from whence it came, its depth, and the number of culverts or sluices under the railroad bed in that vicinity, and the distance from each other; stated the absorbing quality of the land; stated the natural direction the water would have taken after reaching the vicinity of the lands involved in the controversy had there been no obstruction to its flow by the railroad embankment, or a larger outlet by culverts or sluices than was maintained by appellant, as compared with what was the flow of the water through the culverts or sluices actually maintained.

It is true, as contended by appellant, that appellee's land is located in a natural depression, the area of the lands embraced therein on the north side of the railroad bed, as shown by the evidence, is some 117 acres, and on the south side of the railroad bed not so clearly shown, but the acreage actually covered by the water was estimated at some 85 acres. Appellee's property, about a 3-acre tract, is on the south side of the railroad track, and extending in a narrow strip from the county road on the south to the railroad right of way on the north, the elevation near the county road on the side of appellee's property being slightly higher than on the end next to the railroad right of way.

The evidence sufficiently shows, we think, that practically all of the water that came into the depression in which appellee's land is situated came in from the north side of the railroad track, probably beginning at Martinez street on the west, and its tendency, unhindered, would be to flow southeast; that the land as to elevation and otherwise was practically the same on each side of the railroad track in the vicinity of the lands in question, if any difference, a slightly more depression on the north side than near the county road on the south side. The map made by Engineer R. J. Owen, and introduced in evidence by appellee, and the evidence in connection with the map, show the boundary of the depression of the land beginning with Martinez street on the north and northeast side of the railroad track; that the distance from Martinez street, going east to the culvert marked 823C under the railroad track, is 12,215 feet. The first culvert, a 30-foot culvert, under the railroad track going southeast from Martinez street, is at a distance of 3,877 feet at 826A. Going on southeast with

the railroad track, the next culvert is 7,047 feet from Martinez street. The next and only other culvert under the railroad track is at the end of the 12,215 feet. Three openings in all are shown under the railroad track over a distance of about 2½ miles in that low land or depression. Practically all of the surface water for some miles on the north side of the railroad track drains onto the low lands along the railroad track on the north and northeast side and between Martinez street on the west, and within the 2½ miles distance going southeast. The witness Owen, a civil engineer, who took the elevations, and made one of the two maps used in evidence, testified:

"If there had not been any railroad track there, or had not been any borrow pit there at the time of this overflow, I do not believe the water would have been confined to going through 30 feet of space, but some of that water would have been distributed over a space there extending across the Hawkins property opposite. If this roadbed had not been there, I can state that that water instead of having that 30 feet outlet under the bridge would have crossed through there over an area or space of probably 600 feet. I am prepared to answer that much of the question. * * * If we had a 600-foot opening, then it is possible that a large percentage of it would have gone back there (over other ground mentioned). It would have had to go over an elevation of 97.9 feet (the elevations are established from a datum line) to have gotten to Potter's land (the land in question). It would have to raise to an elevation of 97.9 feet before a drop of it would have gone over there."

The witnesses at much length testified to their personal observations as to the movements of the water on the north and northeast side of the railroad embankment, the course the water took when it reached the three culverts, and especially the culvert at the east end of the 2½ miles from Martinez street, and the currents formed in passing through.

F. S. Todd, a consulting engineer, and at one time city engineer of the city of El Paso, and living in the area of the overflowed district, and after qualifying to his knowledge of the lay of the land and general conditions at the time of the overflow in question, testified that, if the roadbed and borrow pits were not there, the same volume of water flowing into the basin on the north side of the track would not have passed through the 30-foot opening in the same length of time as it now passes through with the conditions as they exist; that, had there been no roadbed there and no improvements there, the water would have flowed over the entire area and considerable of it absorbed, the larger the area the water flows over the less surface water there will be.

Frank Pukli testified:

"I was there all the time. * * * At that time I observed how the water overflowed on this land here in this triangle (referring to the Owen map) between Pratti's store and Chelsea street. The water came from this culvert right here in a large quantity, like a river. * * * When the water flowed through here it swept all over everything and some of it came through this culvert here, back (west) towards the Potter Floral Company property. I noticed where other water came from that went onto Potter Floral Company property, there is a culvert there under Conception (street. The culvert at 7,047 feet from Martinez street.)"

W. H. Lark, a civil engineer, who had made a survey of the land contiguous to the Potter Floral Company property, testified:

"The contour of that whole body of land in there is generally uniform, the physical contour of it is generally uniform."

The evidence shows that the flood water came on the appellee's property first from the east, then a heavy flow from the west, and stood around the lathhouse and in the lathhouse (where the destroyed plants were) to a depth of about 1½ feet.

The above are very brief quotations from a few of the several witnesses who testified on the trial. The evidence, additional to the two maps, covers some 80 pages of the statement of facts.

Article 6328 of our present statute (Rev. St. 1925), formerly article 6495, provides that railroad companies must provide the necessary culverts or sluices as the natural lay of the land requires for the necessary drainage thereof.

[1] We have concluded that the evidence found in the record is sufficient to have required the submission of the issue to the jury as to whether appellant had performed that statutory duty, and, if not, whether such failure was the proximate cause of the damage complained of.

Appellant's fourth proposition, to the effect that, if the evidence did raise the issues discussed under the first three propositions, still the evidence was not sufficient to enable the court or jury to determine what of the damage was caused by appellant, and propositions 5 and 6, and other propositions, suggest other intervening causes for the damages, such as the county road and the irrigation canal on the south of appellee's property, which intervening causes, it is insisted, prevented the flow of the water past appellee's property and caused the water to stay on the ground longer than it otherwise would have done.

We need not here review the cases to which we are referred such as Siewerssen v. Harris County, 41 Tex. Civ. App. 115, 91 S. W. 333; G., H. & S. A. Ry. Co. v. Vogt (Tex. Civ. App.) 181 S. W. 841; Fort Worth & Denver City Ry. Co. v. Speer (Tex. Civ. App.) 212 S. W. 765; and St. Louis & Santa Fé Ry. Co. v. Jenkins (Tex. Civ. App.) 89 S. W. 1106. We

do not regard the cases sufficiently in point on the facts to rule the instant case.

[2] But, conceding that the county road and the irrigation canal on the south of the property are intervening and contributing causes to the damages sustained, which we do not concede, except for the purpose of the question, we understand the rule to be that, if a damage results from two causes, both due to the wrongful or negligent acts of different principals, but together the efficient producing cause, then, in that event, all the persons whose wrongful acts contribute to cause the damage are liable for the damage resulting, and the wrongful act of the one furnishes no excuse for the wrongful act of the other. We can hardly see how it can be a defense in an action for damages resulting for failure to perform a plain statutory duty to provide and maintain necessary culverts and sluices as the lay of the land requires for the necessary drainage, to say that, because the act of another is likewise an efficient cause or a contributing cause for the damage complained of, the statutory duty is thereby removed. Gulf, C. & S. F. Ry. Co. v. Boyce, 39 Tex. Civ. App. 195, 87 S. W. 397; St. Louis S. W. Ry. Co. v. Jenkins (Tex. Civ. App.) 89 S. W. 1108; Markham v. Houston Direct Nav. Co., 73 Tex. 247, 11 S. W. 131; Gulf, C. & S. F. Ry. Co. v. McWhirter, 77 Tex. 356, 14 S. W. 26, 19 Am. St. Rep. 755; and cases cited; Williams v. Zang (Tex. Com. App.) 279 S. W. 815; City of Graham v. Moseley (Tex. Civ. App.) 254 S. W. 130.

From the authorities we have examined we think it is immaterial whether the county road or the irrigation ditch contributed to cause appellee's damage.

[3] It is urged the court erred in submitting issue 5 to the jury, the insistence being that, the plants being growing plants in the ground, and that they could not be sold as they then were, there would necessarily be expense in cultivating and marketing same; that some of the plants would have to be raised until they bloomed; and that there was no evidence what such expense would be, and that, for reasons stated, the value stated was speculative, hypothetical, and depended upon various undetermined conditions. The issue submitted was:

"What sum, if paid in cash now, would reasonably compensate plaintiff for the damage, if any, proximately caused by such diversion of the surface water?" etc.

In that connection the court instructed the jury, in substance, that, if the jury found that the plants were totally destroyed or rendered without value as a proximate result of the water, the jury would allow the fair market value at the time of their destruction, with interest, and that the element of damage stated, if any, was the only element of damage the jury would consider.

The evidence shows the plants had a market value, and were destroyed by the water. F. J. Vinson, the florist and foreman of the greenhouse for appellee, said:

"Where I speak of their market value, I mean the market value where they were located in El Paso county at the time. * * * And their market value before the overflow was (stating it), and they had no market value immediately after the overflow."

The witness made practically the same statement as to each of the several varieties of plants.

H. L. Potter, president of appellee, on cross-examination, testified as to the treatment of the plants, stated the wholesale and retail values, and said:

"I heard Mr. Vinson testify as to the value of those plants. Those values as given by him related partly to the value of the bloom. He was talking about the value of the bloom and the plant after the bloom is cut. We keep that plant in the ground and let it go on until next spring and subdivide it to make more plants after the bloom is cut. The plants would branch during the winter, and in the spring we take it up, and in the spring we subdivide it to get anywhere from three to eight shoots, eight to ten young plants, which we replant. Mr. Vinson was talking about the plants themselves. * * * His (Vinson) valuation was based on both the bloom it would produce and the plant after it had bloomed and been out."

We do not concur in the suggestion of appellant that the evidence affirmatively shows that the plants had no market value at the greenhouse where they then were and at the time they were destroyed, or that an expense in growing or marketing would necessarily follow. The supposed facts, made the basis of the contention here, were not sufficiently developed by the evidence for us to say that the plants had no value when destroyed, or that expense of cultivation or marketing would necessarily have to be incurred, and such be deducted in order to arrive at their present value.

The witness Vinson stated what he said was the present value of the plants, and that such value was destroyed. In other words, as we view it, the evidence does not bring into the equation the "probable yield at the time of the normal harvest, less the cost and expense of production and marketing," as suggested by appellant.

The verdict and judgment were for less value than the evidence would have sustained.

If we are not in error in the view we have expressed in considering the propositions discussed, the court was not in error in refusing the special charges tendered by appellant.

Finding no reversible error, the case is affirmed.